UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL E.,[1]

     Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

_____/

Case No. 2:22-cv-11370
District Judge Mark A. Goldsmith
Magistrate Judge Kimberly G. Altman

**REPORT AND RECOMMENDATION
ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

I.     Introduction

This is a social security case. Plaintiff Michael E. brings this action under

42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of

Social Security (Commissioner) denying his application for Disability Insurance

Benefits (DIB) for a closed period from October 1, 2015 to May 1, 2018, under the

Social Security Act (the Act). Both parties have filed summary judgment motions,

(ECF Nos. 14, 17), which have been referred to the undersigned for a Report and

---

[1] Consistent with guidance regarding privacy concerns in Social Security cases by
the Judicial Conference Committee on Court Administration and Case
Management, this district has adopted a policy to identify plaintiffs by only their
first names and last initials. *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

1

Recommendation under 28 U.S.C. § 636(b)(1)(B), (ECF No. 2).

For the reasons set forth below, the undersigned RECOMMENDS that Plaintiff's motion, (ECF No. 14), be GRANTED to the extent that it requests remand for consideration of a closed period of disability as a remedy; the Commissioner's motion, (ECF No. 17), be DENIED; and the case should be REMANDED for further proceedings consistent with this Report and Recommendation (R&R).

## II.    Background

### A.    Procedural History

Plaintiff was 56 years old at the time of his alleged onset date of October 1, 2015.  (ECF No. 9, PageID.103, 213).  After obtaining a master's degree, he worked as a math teacher.  (*Id*., PageID.218, 227-231).  Plaintiff alleged disability due to anxiety, depression, thyroid issues, a ruptured Achilles tendon, and irritable bowel syndrome (IBS).  (*Id*., PageID.103-104, 217).

After Plaintiff's application was denied at the initial level, (*Id*., PageID.118-126), he timely requested an administrative hearing, which was held on January 10, 2018, before the ALJ.  (*Id*., PageID.57-97).  On April 3, 2018, the ALJ issued a written decision finding that Plaintiff was not disabled.  (*Id*., PageID.34-56).  On December 4, 2018, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (*Id*., PageID.28-33).

Plaintiff timely filed for judicial review of the final decision in this district, and the case was assigned to the Honorable Robert H. Cleland and referred to the Honorable David R. Grand for the preparation of an R&R on the parties' cross motions for summary judgment.  On October 25, 2019, Chief Magistrate Judge Grand issued an R&R recommending that the case be remanded to the Commissioner for further proceedings.  *Michael E. v. Comm'r of Soc. Sec. (Michael E. I)*,[2] No. 19-10305, 2019 WL 6273455 (E.D. Mich. Oct. 25, 2019), *report and recommendation adopted*, 2019 WL 6254652 (E.D. Mich. Nov. 22, 2019).  Chief Magistrate Judge Grand recommended that on remand the ALJ consider whether Plaintiff qualified for a close period of benefits and also "for further consideration of [Drs. Marion's and Williams'] opinions and the other evidence discussed [in the R&R]."  *Id*., at *8-9.  On November 22, 2019, Judge Cleland adopted the R&R and remanded the case to the Commissioner.

On remand, the Appeals Council vacated the ALJ's decision and remanded the case back to the ALJ.  (*Id*., PageID.609-612).  On June 18, 2020, the ALJ held a second hearing.  (*Id*., PageID.522-546).  Before the hearing, Plaintiff's counsel submitted a brief stating that Plaintiff was now seeking benefits for the closed period of October 1, 2015 through May 1, 2018.  (*Id*., PageID.786).  Plaintiff

---

[2] The undersigned omitted Plaintiff's last name from this case citation out of sensitivity to the privacy concerns noted in the previous footnote.

testified at the hearing, as did a vocational expert (VE).  (*Id*., PageID.523).

Plaintiff offered the following testimony at the hearing.

Plaintiff had not completed any additional education or work training since the previous hearing.  (*Id*., PageID.529).  He also had not worked in any capacity. (*Id*., PageID.529-530).  Plaintiff was taking all prescribed medications, and the side effects of those medications "seem[ed] to be about the same."  (*Id*., PageID.530).

Plaintiff continued to struggle with his right Achilles, which he explained "still [had] not completely healed."  (*Id*.).  He also continued to experience "episodes of numbness and weakness in it and some tightness and some kind of limited certain activities like walking."  (*Id*.).  His family doctor had recommended stretches to help with his symptoms.  (*Id*., PageID.530-531).

Plaintiff still suffered from heartburn.  (*Id*., PageID.531).  He had been taking a daily probiotic (acidophilus) "to help with digestion."  (*Id*.).  He believed that the probiotic was helping to minimize the effects of the heartburn.  (*Id*.). Plaintiff kept experiencing an uncomfortable, burning sensation that he compared to the feeling one has before vomiting.  (*Id*., PageID.531-532).

Plaintiff continued to suffer from IBS.  (*Id*., PageID.532).  Several times each week, Plaintiff would have "bowel movements . . . several times in a row within maybe like a half hour or an hour in the morning."  (*Id*.).  This had been

ongoing for eight to 10 years.  (*Id.*).

Plaintiff's anxiety still affected his life.  (*Id.*, PageID.532-533).  If he was home alone "where everything's kind of calm and quiet," then he was "pretty relaxed."  (*Id.*, PageID.532-533).  However, being in public while doing activities like shopping caused his anxiety to return.  (*Id.*, PageID.532-533).  Plaintiff sometimes experienced panic attacks when he was in public and felt "a lot of anxiety and just a lot of unsureness" when in places like stores.  (*Id.*, PageID.537).  When he felt this way, Plaintiff would "try to leave."  (*Id.*).  Plaintiff estimated that he did not leave his house five or six days a week.  (*Id.*).

When at home, Plaintiff did chores including dishes, laundry, and "cleaning up around the house."  (*Id.*).  Plaintiff became distracted while doing tasks around the house and would sometimes forget to return to a task after being interrupted.  (*Id.*, PageID.537-538).  He had similar issues when having conversations.  (*Id.*, PageID.538).  For example, he would forget the subject of a conversation when asked a question by his wife or son.  (*Id.*).  Plaintiff also tried to avoid shaving when possible and "avoid adding to the pile of laundry[,]" leading him to "just wear the same clothes for a few days in a row."  (*Id.*).

Depression also continued to affect Plaintiff's life.  (*Id.*, PageID.533).  He explained that his depression fluctuated in response to life events.  (*Id.*).  For example, after his mother died, Plaintiff "kind of withdrew and the depression

seemed to get worse for an extended period of time . . . and it took [him] a while to even kind of come back from that and [he] didn't want to be involved in anything." (*Id.*).  He also struggled with nightmares after his mother's death.  (*Id.*).  In the time since, Plaintiff's depression had improved, and he was able to "put it out of [his] mind some now."  (*Id.*).  He also noted that the "depression and the anxiety seem[ed] to kind of go together and they kind of fluctuate and the medication seem[ed] to help."  (*Id.*, PageID.535).

Plaintiff had previously been found to have the severe impairment of attention deficit hyperactivity disorder (ADHD).  (*Id.*, PageID.533-535).  Plaintiff believed that his ADHD symptoms remained "about the same."  (*Id.*, PageID.535).  He still had a hard time finishing a book, and often found himself unable to finish a book before it needed to be returned to the library and frequently had to call the library to ask for his due dates to be extended.  (*Id.*).

Since the last hearing, Plaintiff continued to "do the same things."  (*Id.*, PageID.536).  He mostly "stay[ed] around the house."  (*Id.*).  Plaintiff tried to take "short walks" and "do a little bit of work out in the yard" if he was able to.  (*Id.*).  He had not taken any trips or vacations.  (*Id.*).  When his wife and son went to visit friends and family, Plaintiff "prefer[red] to just stay home."  (*Id.*).  The same was true when his friends invited him to do things with them.  (*Id.*).

On July 23, 2020, the ALJ issued a written decision again finding that

6

Plaintiff was not disabled.  (*Id*., PageID.495-521).  On August 27, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (*Id*., PageID.488-494).  Plaintiff timely filed for judicial review of the final decision.  (ECF No. 1).

B. Medical Evidence

The following summation of the relevant medical evidence is taken from Chief Magistrate Judge Grand's R&R, which the undersigned finds to be both accurate and thorough.

> [Plaintiff] was a math teacher for nearly thirty years – the last fifteen in the Flint Public Schools – until he simply "walked away" from his job on October 1, 2015.  According to [Plaintiff], he did so because he was unable to cope with the anxiety and stress of dealing with a new superintendent, who – despite his protests – was insisting on a "very advanced" curriculum that [Plaintiff] felt "was way over matching [his] students."

> The next day, October 2, 2015, [Plaintiff] presented to his primary care doctor, Edward Holden, M.D., complaining about this ongoing job-related stress and anxiety.  He reported being irritable and short-tempered, saying that he was isolating himself, his stomach was "churning," and he was experiencing 3-4 bowel movements each morning.  An EKG performed that day showed sinus bradycardia.  Dr. Holden diagnosed [Plaintiff] with anxiety, took him off work for two weeks, and advised him to start counseling immediately.  On October 16, 2015, [Plaintiff] returned to see Dr. Holden, continuing to complain of anxiety, chest discomfort, diarrhea, irritability, insomnia, and self-isolating behavior.  Dr. Holden kept him off work pending a psychiatry appointment.  On October 28, 2015, [Plaintiff] reported having started Zoloft, but he continued to feel anxious when thinking about work and suffered from insomnia.  His leave of absence was extended to November 11, 2015.

7

On November 3, 2015, [Plaintiff] was evaluated by Shurkela Mason, LPC at Delta Family Clinic South.  Ms. Mason noted that [Plaintiff] was having trouble sleeping, was very depressed and sad, had little desire to interact with his family, and became "physically ill, depressed, sad, and anxious" when thinking about returning to his teaching position.  She diagnosed [Plaintiff] with major depressive disorder (severe) and generalized anxiety disorder, assigned him a Global Assessment of Functioning ("GAF") score of 50, and referred him for a psychiatric examination and individual therapy.

On December 10, 2015, [Plaintiff] went to Delta Family Clinic South, where Dr. Williams noted that he was still struggling with depression and anxiety, was hyperverbal, had a GAF score of 52, and required further psychiatric testing.  At a December 15, 2015 psychiatric evaluation, Dr. Williams noted that, on examination, [Plaintiff] was poorly groomed, with a guarded attitude, blunted affect, and anxious and dysphoric mood.  Dr. Williams further noted that [Plaintiff] was pacing and had distracted attention/concentration, poor recent memory, and tangential thought process.  After considering the results of psychological testing performed that day, Dr. Williams diagnosed [Plaintiff] with attention deficit hyperactivity disorder and anxiety disorder and opined:

> The results from the formal test instruments does also clearly implicate the likely presence of difficulties with sustained attention, concentration, and distractibility.  He did appear to be able to function in the low stimulus test environment but even relatively minor increases in the ambient stimulus levels of the room yielded significant declines in his ability to maintain his focus.
>
> ***
>
> [H]e does also appear to be experiencing an anxiety disorder.  He does report significant stress and anxiety regarding job-related issues.  He was also noted to be somewhat anxious during the process of this evaluation.  The results from the formal personality test instruments does also implicate the likely presence of significant levels of anxiety and stress.  It is quite likely that he developed

8

his anxiety disorder secondary to his difficulties with
sustained attention and concentration.

\*\*\*

Due to the severity of this individual[']s current cognitive
and emotional issues, it is not likely that he will be able to
establish or maintain gainful employment.

[Plaintiff] continued to see Ms. Mason for therapy throughout 2016.
On February 3, 2016, she noted that [Plaintiff] was "still not doing
well." He continued to experience anxiety and depression, thinking
about his former students and their families constantly, and worrying
about their well-being. He was "very jittery and anxious," could not
keep still, and had difficulty maintaining focus. On March 16, 2016,
Ms. Mason noted that [Plaintiff] remained very depressed and felt
"helpless and sad for his students and their families." He had developed
a facial tic and IBS as a result of ongoing depression and anxiety.
Similarly, on May 18, 2016, [Plaintiff] was described as "very anxious,
sad, and jittery." On June 14, 2016, Ms. Mason noted that he "was not
in a good place mentally," but, rather, was sad and depressed.

At his next visit to Ms. Mason, on July 27, 2016, [Plaintiff] was again
anxious and sad, with low affect, and was "obsessing" over "how things
are going to end for him[.]" He continued to express concern for his
co-workers and students, saying it was very hard for him to focus, while
dealing with his emotional and physical problems. By September 2016,
[Plaintiff] still "was not doing very well," and Ms. Mason noted:

[Plaintiff] reported that, he is still very sad about not
teaching. [He] keeps going over in his mind the scenarios
of him having to go on sick leave. [Plaintiff] reported that,
he has been very anxious and depressed, thinking about
his job and his students. [Plaintiff] reported that, he has
been very sad, depressed, anxious, and felt hopeless about
himself.

In November 2016, [Plaintiff] transitioned to a new therapist at Delta
Family Clinic South, Donna Marion, Ph.D., LMSW. Dr. Marion noted
that [Plaintiff's] "entire conversation was on the negatives in his life,"

9

and he was "anxious and upset and seemed to project no positive thoughts for his future." At his next visit, [Plaintiff] spent a lot of time "venting" about "being pushed out of his job due to circumstances beyond his control." In February 2017, [Plaintiff] appeared "a little sad" and continued to "struggle with flashbacks concerning his previous job and the unfairness of the circumstances he currently finds himself [in]." In March 2017, Dr. Marion noted that [Plaintiff] was "still obsessing a lot about the injustice in his life and the unfairness of the system and the lack of opportunities to make meaningful changes in his life." In May 2017, Dr. Marion noted that [Plaintiff] continued to feel anxious, confused, lost, and angry that his "life and career ended abruptly" and that he had been "the victim of a malicious system." Two months later, Dr. Marion observed that [Plaintiff] continued to exhibit pressured speech and thoughts; he was still experiencing flashbacks and nightmares; and that his "symptoms and PTSD are still very strong daily and intrusive for him."

[Plaintiff] returned to Dr. Williams for another psychiatric evaluation on August 10, 2017, with mental status examination revealing anxious mood, pressured speech, and obsessive thought content. Dr. Williams' diagnoses included PTSD and dysthymic, and he prescribed Lexapro, Restoril, and Ativan. When [Plaintiff] returned to see Dr. Marion on November 17, 2017, she noted:

> Subjectively [Plaintiff] seemed to have pressured speech, lots of neg[a]tive comments and complaints[.] He had some paperwork for social security and it took a long while to answer each question as he perseverated over each. Most of his [p]erseverations related to his past job[.] He seemed to have difficulty thinking of situations where he might move to a new job. He explained he is having problems with social situations where he is embarrassed by his lack of a job as well as having social phobia. He seemed to perseverate continuously on his teaching problems. Overall he seems to have made little progress in his condition since the last visit.

That same day, Dr. Marion completed a "Medical Assessment of Ability to Do Work-Related Activities (Mental)," in which she opined that [Plaintiff] is markedly limited in the ability to understand,

remember, and carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; complete a normal workday and work week without interruption from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting.

*Michael E. I*, at *3-6 (internal record citations and footnote omitted).

III.     Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively

presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff was not disabled under the Act. (ECF No. 9, PageID.499). At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 1, 2015, his alleged onset date. (*Id.*, PageID.500). At Step Two, the ALJ found that he had the severe impairments of status/post right Achilles tendon and tear and repair, gastroesophageal reflux disease (GERD), obesity, dysthymic disorder, ADHD, generalized anxiety disorder, major depressive disorder, and post-

traumatic stress disorder (PTSD).  (*Id*.).  At Step Three, the ALJ found that none of

Plaintiff's impairments met or medically equaled a listed impairment.  (*Id*.,

PageID.500-503).

The ALJ then assessed Plaintiff's RFC, concluding that he was capable of

performing

> medium work as defined in 20 CFR 404.1567(c) except he can
> occasionally climb stairs and ramps, but he could never climb ladders,
> ropes, or scaffolds.  He can occasionally use foot controls with the right
> lower extremity.  He must avoid all exposure to unprotected heights.
> He must avoid concentrated use of hazardous moving machinery.  He
> is limited to simple, routine, and repetitive tasks performed in a work
> environment free of fast-paced production requirements involving only
> simple work related decisions and routine work place changes.  He is
> limited to work with only occasional interaction with the public.

(*Id*., PageID.503-514).

At Step Four, the ALJ found that Plaintiff could not perform any past

relevant work.  (*Id*., PageID.514).  At Step Five, the ALJ determined, based in part

on testimony provided by the VE in response to hypothetical questions, that

Plaintiff was capable of performing the jobs of dishwasher (500,000 jobs

nationally), laundry worker (190,000), and packer (340,000).  (*Id*., PageID.515).

As a result, the ALJ concluded that Plaintiff was not disabled under the Act.  (*Id*.,

PageID.516).

## IV.    Standard of Review

A district court has jurisdiction to review the Commissioner's final

administrative decision under 42 U.S.C. § 405(g).  Although a court can examine

portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health*

*& Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial

review is constrained to deciding whether the ALJ applied the proper legal

standards in making his or her decision, and whether the record contains

substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775

F. App'x 220, 224-225 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506,

509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts

of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*,

880 F.3d 778, 783 (6th Cir. 2017) (same), *aff'd sub nom. Biestek v. Berryhill*, 139

S. Ct. 1148 (2019).

An ALJ's factual findings must be supported by "substantial evidence."  42

U.S.C. § 405(g).  The Supreme Court has explained:

> Under the substantial-evidence standard, a court looks to an existing
> administrative record and asks whether it contains sufficient evidence
> to support the agency's factual determinations.  And whatever the
> meaning of substantial in other contexts, the threshold for such
> evidentiary sufficiency is not high.  Substantial evidence, this Court has
> said, is more than a mere scintilla.  It means—and means only—such
> relevant evidence as a reasonable mind might accept as adequate to
> support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

In making "substantial evidence" the relevant standard, the law preserves the

judiciary's ability to review decisions by administrative agencies, but it does not

grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) (" 'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.' " (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009))). An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal quotation marks and citation omitted). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the [Social Security Administration (SSA)] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (internal quotation marks and citations omitted).

15

## V.    Analysis

Plaintiff argues that the ALJ failed to properly evaluate the medical opinions of record and, in so doing, failed to remedy the flaws in his original decision that Chief Magistrate Judge Grand found warranted remand.  The Commissioner responds that substantial evidence supports the ALJ's decision and that the ALJ adequately explained his evaluation of the medical opinions.  As will be explained below, the undersigned agrees that the ALJ failed to properly evaluate the medical opinions and ultimately that his second decision contains the same flaws explained by Chief Magistrate Judge Grand in *Michael E. I.*

### A.    Treating Source Rule

Plaintiff applied for DIB before March 27, 2017, meaning the ALJ was required to "give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (cleaned up).[3]  In the presence of contradicting substantial evidence however, the

---

[3] In contrast, for claims made on or after March 27, 2017, the ALJ must weigh both treating and non-treating medical evaluations based on how well they are supported by the remainder of the record.  20 C.F.R. § 404.1520c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources").

ALJ may reject all or a portion of the treating source's findings, *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391-392 (6th Cir. 2004), provided that he supplies "good reasons" for doing so, *Wilson*, 378 F.3d at 544-548 (citing 20 C.F.R. § 404.1527(d)(2)).

In declining to give less than controlling weight to the treating provider's opinion, the ALJ must consider the (1) "length of the treatment relationship," (2) "frequency of examination," (3) "nature and extent of the treatment relationship," (4) "supportability of the opinion," (5) the "consistency of the opinion with the record as a whole," and (6) "specialization of the treating source." *Wilson*, 378 F.3d at 544. "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; [he] need only provide good reasons for both [his] decision not to afford the physician's opinion controlling weight and for [his] ultimate weighing of the opinion. *Biestek*, 880 F.3d at 785 (cleaned up).

### B.   Application

#### 1.   Chief Magistrate Judge Grand's R&R

In order to contextualize the problems with the ALJ's second decision, a discussion of Chief Magistrate Judge Grand's R&R is necessary. In his R&R, Chief Magistrate Judge Grand explained that

> the ALJ considered Dr. Williams' December 2015 opinion that [Plaintiff] has difficulties with sustained attention, concentration, and distractibility; significant stress and anxiety regarding job-related issues; and that he cannot be around people. The ALJ gave this opinion

17

little weight because it was "inconsistent with the general pattern of evidence contained in the hearing level record."  Similarly, the ALJ considered Dr. Marion's November 2017 opinion that [Plaintiff] is markedly limited in several areas, including, in relevant part, the ability to work in coordination with or proximity to others without being distracted by them; complete a normal workday and work week without interruption from psychologically-based symptoms; and respond appropriately to changes in the work setting.  However, the ALJ gave this opinion little weight too, finding it "inconsistent with the general pattern of evidence contained in the hearing level record."

*Michael E. I*, 2019 WL 6273455, at *6 (internal record citations and footnote

omitted).  Chief Magistrate Judge Grand found that "the ALJ's analysis of these

opinions failed to comply with his obligations under the treating physician rule."

*Id*.

Chief Magistrate Judge Grand noted that

in rejecting the opinions of [Plaintiff's] treating providers as "inconsistent with the general pattern of evidence," the ALJ did not cite to any specific treatment notes, medical records, testimony, or other evidence, nor did he explain how or why such evidence purportedly was inconsistent with the opinions of Dr. Williams and Dr. Marion.

*Id*., at *7 (internal record citation omitted).  Because the of the ALJ's failure to

provide citations and explanations, Chief Magistrate Judge Grand was "unable to

provide a meaningful review of the ALJ's decision to discount those opinions."  *Id*.

(cleaned up).  Chief Magistrate Judge Grand further noted that "[w]hile the ALJ

need not address every piece of evidence in the record, *Kornecky* [*v. Comm'r of

Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)], he does not fairly discharge his

duties when he fails to meaningfully discuss significant contradictory portions of

18

the record." *Id.*, at *8.  He also said that "because many of the records not discussed by the ALJ relate to the 12-plus month period immediately following [Plaintiff's] alleged onset date, it is possible that [Plaintiff] could qualify for a closed period of disability.  But, that is a matter for the ALJ to analyze in the first instance." *Id.*

### 2.    ALJ's Second Decision

The ALJ repeated many of the same mistakes in his second decision as the ones identified by Chief Magistrate Judge Grand.  Critically, the ALJ failed to consider whether Plaintiff qualified for a closed period of benefits as directed by Chief Magistrate Judge Grand.  *Michael E. I*, at *8.  Additionally, in his prehearing brief, Plaintiff requested DIB for a closed period beginning on his onset date of October 1, 2015, and ending on May 1, 2018.  (ECF No. 14, PageID.859 (citing ECF No. 9, PageID.786)).  This request is repeated in Plaintiff's brief before this Court.  (ECF No. 14, PageID.831).

Despite Plaintiff's request that the ALJ consider whether he qualified for a closed period of DIB, and despite Chief Magistrate Judge Grand's direction to consider the same, the ALJ failed to discuss whether an award of DIB for a closed period would be appropriate in this case.

"A claimant no longer qualifying as disabled may be entitled to benefits if [he] previously suffered a disability for a continuing, twelve-month period." *Turk*

*v. Comm'r of Soc. Sec.*, 647 F. App'x 638, 641 (6th Cir. 2016). "A claimant who meets the twelve-month durational requirement of 42 U.S.C. § 423(d)(1)(A) may be entitled to benefits from the time [his] disability commences until such time as the disability ceases." *Widener v. Astrue*, No. 08–107–DLB, 2009 WL 2778215, at *5 (E.D. Ky. Aug. 27, 2009). Other district courts in this Circuit have remanded cases when a plaintiff requests a closed period of benefits, but the ALJ chooses to focus on the plaintiff's current limitations, condition at the time of the hearing, or uses the present tense to discuss the plaintiff's limitations. *See, e.g.*, *Brazzell v. Astrue*, No. 5:09CV92-J, 2009 WL 5217361, at *4 (W.D. Ky. Dec. 30, 2009); *Widener*, at *5.

Additionally, the ALJ explicitly considered evidence *outside* of the closed period of October 1, 2015 to May 1, 2018, and found that later evidence pointed against finding Plaintiff disabled. Over a page of the ALJ's second decision is devoted to discussing evidence from after May 1, 2018. (ECF No. 9, PageID.509-510). The ALJ also used this evidence to reach the conclusion that Plaintiff "appear[ed] to have sought treatment to bolster his claim for disability as evidenced by his cessation of treatment immediately following his January 2018 hearing and not resuming treatment until over two years later, a few weeks after the Appeals Council ordered a remand for a new hearing." (*Id.*, PageID.510). Thus, the ALJ failed to consider whether Plaintiff qualified for a closed period of

20

DIB as requested by Plaintiff and directed by Chief Magistrate Judge Grand in addition to using evidence postdating the closed period against Plaintiff.  To this extent, the ALJ failed to comply with the directive on remand to consider whether Plaintiff was disabled during from October 1, 2015 to May 1, 2018.

Moreover, in his second decision, the ALJ again failed to properly evaluate the medical opinions of Plaintiff's treating providers.  The ALJ wrote the following regarding the opinion of Dr. Marion:

> The undersigned has considered the opinion of Donna Marion, Ph.D., LMSW, one of the claimant's treating therapists who completed a Medical Source Statement in November 2017.  Dr. Marion found that the claimant was markedly limited in the ability to understand, remember, and carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; complete a normal work day or work week without interruption from psychological symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods; and respond appropriately to changes in the work setting.  Otherwise, Dr. Marion found that the claimant had no more than moderate limitations in any other mental ability.  Although Dr. Marion was the claimant's treating therapist, the opinion has not been given controlling weight, as it is not well supported and inconsistent with the record.  The undersigned affords partial weight to this opinion.  Dr. Mason [sic] first saw the claimant in November 2016.  She noted the claimant was subjectively very nervous and focused the discussion on leaving his teaching job. Objectively, however, he continued to function as a husband and father of a teenage boy and felt his relationships had improved, but was discouraged as he felt he had no options but to retire and seek disability. At the next appointment, Dr. Marion suggested medications, but the claimant declined, stating he felt he was doing best with alternative positive activities.  While the claimant continued to focus on negative thoughts in therapy sessions, he also reported spending more time with his family, being engaged with his son's school and sport activities, and spending time in the library; he also continued to decline medications,

21

stating he was doing better and not in need of medications. Over the course of one year, the claimant saw Dr. Marion for only seven therapy sessions; there is no indication that more frequent treatment was recommended. The course of treatment pursued has not been consistent with what one would expect if the claimant was truly disabled. While there is some support in the record (largely Dr. Williams' psychological testing, which as discussed below is internally inconsistent) for deficits in concentration that support limitations to simple instructions/tasks, routine work place changes, and only occasional interaction with the public, there is no explanation by Dr. Marion nor objective support in her treatment records of marked limitation in completing a normal workday or workweek without interruption from psychological symptoms. Perhaps that is true of his past employment, given his continued negative focus on the circumstances at the end of his teaching career, but the record does not support that the claimant is incapable of performing any activities without interruption from psychological symptoms.

Regarding Dr. Williams' opinion, the ALJ wrote:

The undersigned has considered the opinions of Gerard R. Williams, Ph.D., one of the claimant's treating psychologists. Based on a psychological evaluation, performed on December 14, 2015, Dr. Williams concluded that, "due to the severity of this individual's current cognitive and emotional issue, it is not likely that he will be able to establish or maintain gainful employment." Based on a mental status examination, on December 15, 2015, Dr. Williams found that the claimant could not be around people. Although Dr. Williams was the claimant's treating psychologist, the opinion has not been given controlling weight, as it is not well supported and inconsistent with the record. The undersigned affords little weight to these opinions because they are inconsistent with the general pattern of evidence contained in the hearing level record. Each of these opinions was formed during the Dr. Williams' initial assessments of the claimant and prior to the claimant engaging regularly in treatment. Further, Dr. Williams' findings in his psychological testing are internally inconsistent. Within the body of the report, Dr. Williams stated that the claimant did not evidence impairments with regard to his auditory attention or with regard to his sustained attention and concentration; he did not exhibit a susceptibility to distraction and his performance on the Conners'

Continuous Performance Test did not yield indices of impaired attention and concentration within the low stimulus test environment. Yet, in the conclusion of the report, he states nearly the opposite, that the claimant was rather distractible and the results from the formal test instruments clearly implicate the likely presence of difficulties with sustained attention, concentration, and distractibility.  Dr. Williams explained that the claimant did appear to be able to function in the low stimulus test environment but even relatively minor increases in the ambient stimulus levels of the room yielded significant declines in his ability to maintain his focus.  Rather than identifying limitations to address the claimant's decline in focus in more than a low stimulus environment, Dr. Williams leapt to the conclusion that the claimant was unable to maintain gainful employment.  The opinion expressed is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion.  Further, this opinion was not reassessed after being established in treatment and throughout mental health treatment records, objective mental status examinations documented no more than moderate symptoms, and with treatment often documented no more than mild anxiety.  Finally, statements that a claimant is "disabled," "unable to work," or the like, are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein.  Such issues are reserved to the Commissioner, who cannot abdicate the statutory responsibility to determine the ultimate issue of disability (20 CFR 404.1527(e)).

(ECF No. 9, PageID.512-514 (internal record citations omitted)).  The ALJ's

analysis is flawed.

First, as the Commissioner admits in her motion for summary judgment, the

ALJ "did not perfectly restate [Dr. Marion's] comments" regarding Plaintiff's

decision early in treatment not to take psychotropic medication.  (ECF No. 17,

PageID.873).  The ALJ wrote that "Dr. Marion suggested medications, but the

claimant declined, stating he felt he was doing best with alternative positive

activities." (ECF No. 9, PageID.512 (internal record citation omitted)).  In reality, after their December 9, 2016 appointment, Dr. Marion wrote that she and Plaintiff "did not discuss [the possibility of medication] at this meeting as he feels he is doing best with some alternative positive activities." (*Id.*, PageID.449).  She also noted that the plan was for Plaintiff to focus on "[c]ognitive/behavioral and solution focused for positive coping and stress" as well as "anxiety reduction strategies." (*Id.*).

The Commissioner argues that the ultimate point was that Plaintiff did not want to take medication and says that this cuts against his claim for disability, (ECF No. 17, PageID.873); the undersigned is unconvinced.  The ALJ's failure to adequately summarize record evidence suggests that he did not accurately assess the medical evidence when deciding whether Plaintiff was disabled.  Moreover, nothing in Dr. Marion's December 9, 2016 notes indicate that she suggested medications to Plaintiff; instead, her notes indicate that she and Plaintiff did not discuss medication at all.

Second, the ALJ failed entirely to account for Dr. Williams' August 2017 evaluation when considering his opinion.  In fact, the ALJ discounts Dr. Williams' December 2015 opinion in part because that "opinion was not reassessed after being established in treatment[.]" (ECF No. 9, PageID.513).  But the August 2017 evaluation echoes many of Dr. Williams' prior concerns, specifically noting that

Plaintiff continued to struggle with an anxious mood, pressured speech, and

obsessive thought content.  (*Id*., PageID.466).  Dr. Williams also prescribed

Plaintiff Lexapro (antidepressant), Restoril (benzodiazepine sedative hypnotic),

and Ativan (benzodiazepine).  (*Id*., PageID.467).  It is unclear why the ALJ failed

to consider Dr. Williams' August 2017 evaluation and instead negatively–and

inaccurately–commented that Dr. Williams never reassessed his December 2015

evaluation.

In addition to the opinions of Plaintiff's treating providers, the ALJ

considered the opinion of the State agency psychological consultant Leonard

Balunas, Ph.D. (Dr. Balunas) "who examined [Plaintiff's] records at the initial

level."  (*Id*., PageID.511).  The ALJ wrote:

> Dr. Balunas assessed the claimant under prior paragraph B areas of
> mental functioning, such that he found the claimant had mild restriction
> in activities of daily living, mild difficulties in maintaining social
> functioning, moderate difficulties in maintaining concentration,
> persistence or pace, and had experienced no episodes of
> decompensation.  Dr. Balunas prepared a mental residual functional
> capacity and found that the claimant was able to understand, carry out,
> and remember simple instructions; make judgments that are
> commensurate with the functions of unskilled tasks *i.e.*, work-related
> decisions; respond appropriately to supervision, coworkers, and work
> situations; deal with most changes in routine work settings; no
> problems with attention and sufficient concentration to perform simple
> 1-2 step tasks all on a routine and regular basis.  The undersigned
> affords significant weight to this opinion because it is consistent with
> the general pattern of evidence contained in the hearing level record.
> The opinion is supported by Dr. Balunas' review of the record and
> detailed explanation.  Throughout mental health treatment records,
> objective mental status examinations documented no more than

> moderate symptoms, and with treatment often documented no more than mild anxiety.

(*Id*. (internal record citation omitted)).

The ALJ's heavy reliance on Dr. Balunas as opposed to Plaintiff's treating providers is problematic under the treating provider rule.  First, Dr. Balunas reviewed Plaintiff's records on April 26, 2016, so he only had the benefit of less than six months of Plaintiff's mental health treatment records.  (*Id*., PageID.107-109).  Further, he did not speak to Plaintiff.  The Sixth Circuit has noted that

> [t]he importance of a non-examining source having a complete medical snapshot when reviewing a claimant's file was emphasized in a 1996 Ruling of the Social Security Administration:
>
>> In appropriate circumstances, opinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources . . . if the State agency medical . . . consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245 n.4 (6th Cir. 2007) (quoting Soc. Sec. Rul. 96–6p, 1996 WL 374180, at *3 (July 2, 1996)).  Here, Dr. Balunas only reviewed a small portion of the relevant medical records and did not have any additional information than what was available to Drs. Marion and Williams.  Thus, the ALJ's decision to give Dr. Balunas' opinion greater weight than to those of Drs. Marion's and Williams' is not well supported.

26

Moreover, the ALJ's second opinion repeated much of the same language in his first decision.  As Plaintiff notes, the ALJ "adopted much of his prior decision (often word for word) including his severe impairment finding; analysis of paragraph B (mental health) criteria including: remember and apply information, interact with other, maintain concentration and ability to adapt and [RFC] assessment."  (ECF No. 14, PageID.847-848 (internal record citations omitted)).

Additionally, the ALJ's analysis casts considerable doubt on the accuracy of his RFC assessment.  Even though the ALJ "afford[ed] significant weight" to Dr. Balunas' opinion, (ECF No. 9, PageID.511), and chose not to give controlling weight to the opinions of Drs. Marion and Williams, (*Id*., PageID.512-514), in his RFC assessment he stated that Plaintiff was moderately impaired in all paragraph B areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  However, Dr. Balunas only opined that Plaintiff was moderately impaired in the area of concentrating, persisting, or maintaining pace.  *Compare id*., PageID.501-502 *to id*., PageID.109.  Thus, the ALJ did not link his RFC assessment to the evidence he found to be more persuasive.  Other courts have found that under such circumstances, the RFC assessment is not supported by substantial evidence.  *See Evans v. Comm'r of Soc. Sec.*, No. 1:10–cv–779, 2011 WL 6960619, at *14-15 (S.D. Ohio Dec. 5, 2011)

(holding that "simply listing some of the . . . evidence contained in the record and setting forth an RFC conclusion without linking such evidence to the functional limitations ultimately imposed in the RFC is insufficient to meet the 'narrative discussion' requirement of SSR 96-8[p]"), *report and recommendation adopted*, 2012 WL 27476 (S.D. Ohio Jan. 5, 2012).  It may be the case that the ALJ used the treaters' opinions to restrict the RFC beyond Dr. Balunas' recommendation, but the ALJ's reasoning for adopting some, but not all, of the treaters' opinions is absent from the decision.

In sum, the ALJ did not follow the directive on remand to further explain the reasons for the disability finding, particularly as to discounting the opinions of Plaintiff's treating providers.  In fact, the ALJ failed to discuss one of Dr. Williams' opinions within the relevant timeframe.  He also did not consider whether Plaintiff qualified for a closed period of benefits as directed.  As such, the ALJ's decision should be reversed.

### 3.  Remedy

Plaintiff asks that this Court reverse and order benefits granted to avoid giving the Commissioner a third bite at the apple in this case.

"Generally, benefits may be awarded immediately 'only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.' "  *Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813,

827 (S.D. Ohio 2011) (quoting *Faucher v. Sec'y of Health & Human Servs.*, 17

F.3d 171, 176 (6th Cir.1994)).  "The Court may award benefits where the proof of

disability is strong and opposing evidence is lacking in substance, so that remand

would merely involve the presentation of cumulative evidence, or where the proof

of disability is overwhelming."  *Douglas*, 832 F. Supp. 2d at 827.

　　The undersigned acknowledges Plaintiff's frustration with the administrative

process given that this is his second appeal.  However, as noted by Chief

Magistrate Judge Grand, the issue of whether Plaintiff is entitled to a closed period

of DIB "is a matter for the ALJ to analyze in the first instance."  *Michael E. I*, at

*8.  Remand would not be an idle exercise, but instead would afford Plaintiff the

opportunity to have the evidence of his alleged disability properly considered for

the closed period.  Thus, it is recommended that this case be reversed and

remanded for rehearing, rather than reversed for an award of benefits.

## VI.　　Conclusion

　　For the reasons stated above, it is RECOMMENDED that Plaintiff's motion,

(ECF No. 14), be GRANTED to the extent that it requests remand for

consideration of a closed period of disability as a remedy; the Commissioner's

motion, (ECF No. 17), be DENIED; and that the case be REMANDED for further

proceedings consistent with this R&R.  Specifically, the ALJ should be directed to

determine whether Plaintiff was disabled under the Act from the period of October

1, 2015 to May 1, 2018, and to follow 20 C.F.R. § 404.1527(d)(2) and Sixth

Circuit caselaw in evaluating the opinions of Plaintiff's treating providers during

that period.

Dated: July 25, 2023                    s/Kimberly G. Altman
Detroit, Michigan                       KIMBERLY G. ALTMAN
                                        United States Magistrate Judge

### NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Hum. Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2,"

etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," etc.  If the Court determines that any objections are without

merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of
record and any unrepresented parties via the Court's ECF System to their
respective email or First Class U.S. mail addresses disclosed on the Notice of
Electronic Filing on July 25, 2023.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager

31